ORIGINAL FILED
07 JUL -2 AM 10:08
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

R. SCOTT ERLEWINE (State Bar No. 095106)
MEAGAN MCKINLEY-BALL (State Bar No. 245375)
PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center, Suite 2350
San Francisco, California 94111
Telephone: (415) 398-0900
Facsimile: (415) 398-0911

Attorneys for Plaintiff
Norca Industrial, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NORCA INDUSTRIAL, LLC, a New York Limited Liability Company,

Plaintiff,

v.

ROBERT WREN, an individual; PRIMROSE METALS, INC., a California corporation; RICHARD RAYBIN, an individual; LIFETIME CAPITAL GROUP, an unknown entity; VICTORIA PICOLOTTI, an individual;

Defendants.

NO. C O7 3425 EDL

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF NORCA INDUSTRIAL, LLC'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION, AND FOR LEAVE TO CONDUCT EXPEDITED DISCOVERY**

Date: June 25, 2007
Time: 10:00 a.m.
Place: Clerk's Office, 16th Flr.

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. Norca's "Boiler Tube" Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. The Critical Changwon Mill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C. Norca's Trade Secret and Confidential Proprietary Information . . . . . . . . . . . . . . . 6

D. Robert Wren . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

E. Wren's Suspicious Behavior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

F. The Scheme Is Uncovered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1. The "You and Me" Emails. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2. The Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

3. Financing For The Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4. Disclosure of Norca's Trade Secrets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5. Wren Seeks To Exclude Norca's President From Visits to Suppliers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

6. Wren Targets Additional Suppliers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

7. Wren/Song Refuse to Cooperate With One Of Norca's Suppliers. . . . . . 12

G. This Shocking Discovery Accelerates Defendants' Scheme . . . . . . . . . . . . . . . . 12

H. Norca Terminates Wren's Employment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. Defendants Unleash Their Trojan Horse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

J. The True Magnitude of Defendants' Unlawful Scheme Is Becomes Evident. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

K. Diverted Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

L. The Need for Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

-i-

III. NORCA HAS SATISFIED THE REQUIREMENTS FOR ISSUANCE OF INJUNCTIVE RELIEF .................... 18

B. Norca Is Likely to Succeed On The Merits of Its Claims for Relief .......... 19

1. Trade Secret Claims .................................... 19

2. Unfair Competition Claim .................................... 20

3. Breach of Fiduciary Duty and Breach of Loyalty Claims ............ 21

4. Intentional Interference Claims .......................... 22

C. Irreparable Harm and Lack of an Adequate Remedy at Law ................ 23

D. Balancing of the Hardships and the Public Interest ...................... 25

IV. THE COURT SHOULD PERMIT NORCA TO CONDUCT EXPEDITED DISCOVERY .................... 25

V. CONCLUSION ............................................ 26

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

## TABLE OF AUTHORITIES

### CASES

*American Express Fin. Advisors, Inc. v. Yantis*, 358 F.Supp.2d 818, 835 (N.D.Iowa 2005) . . . . 24

*Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531 (1987) . . . . 25

*Bancroft-Whitney v. Glen*, 64 Cal. 2d 327, 345 (1966) . . . . 21

*Berda v. Grand Lodge of IAM*, 584 F.2d 308, 315 (9th Cir. 1978) . . . . 19

*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-103 (3d Cir. 1992) . . . . 24

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 173-174 (2000) . . . . 20

*Courtesy Temporary Service, Inc.*, 222 Cal. App. 3d 1278, 1292 . . . . 20

*Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1086 (9th Cir. 2003) . . . . 22

*Ellsworth Associates, Inc. v. U.S.*, 917 F.Supp. 841, 844 (D.D.C.,1996) . . . . 26

*Ernst & Ernst v. Carlson*, 195 Cal. 2d 45, 50 . . . . 23

*Flynt Distrib. Co., Inc. V. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) . . . . 18

*Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) . . . . 19

*Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) . . . . 18

*Huong Que, Inc. v. Luu*, 150 Cal.App.4th 400, 417 (2007) . . . . 22

*Imi-Tech Co. v. Gaaliani*, 691 F. Supp. 214 (S.D. Cal. 1986) . . . . 20

*Lakeview Technology, Inc. v. Robinson*, 446 F. 3d 655, 657 (7th Cir. 2006) . . . . 25

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

-iii-

*Lowell v. Mother's Cake & Cookie Co.*, 79 Cal. 3d 13 (1978) . . . . . 23

*North Atlantic Instruments, Inc. v. Haber*, 188 F. 3d 38, 49 . . . . . 24

*Optinrealbig.com, LLC v. Ironport Systems, Inc.* 323 F.Supp.2d 1037, 1050 (N.D.Cal.,2004) . . . . . 23, 24

*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908-909 (2nd Cir.1990) . . . . . 24

*Rx USA Wholesale Services Inc., v. Department of Health and Human Services*, 467 F. Supp. 2d 285, (E.D.N.Y. 2006) . . . . . 24

*Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002) . . . . . 25, 26

*Southwest Voter Registration Education Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003) . . . . . 18

*Stanley v. University of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994) . . . . . 18

*Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 . . . . . 21

*Wilson v. Watt*, 703 F.2d 395 (9th Cir. 1983) . . . . . 19

**STATUTES**

Cal Civ. Code § 3426.1(b) . . . . . 20

Cal. Civ. Code Section 3426 . . . . . 19

Cal. Civ. Code § 3426.2(a) . . . . . 20

Cal. Civ. Code. § 3426.1(d) . . . . . 19

F.R.C.P. 26(d) . . . . . 25

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

-iv-

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Norca Industrial LLC ("Norca"), headquartered in New York, is engaged in the business of selling specialized "boiler tubes" ordered from customer specifications in the power generation business. Three weeks ago (on June 6th), Norca was shocked to discover that its Executive Vice President, Robert Wren ("Wren"), who worked in a two-person Norca office in Burlingame, California and was responsible for tens of millions of dollars in annual Norca sales, had for months, in concert with Norca's agent in Asia, Steve Song ("Song"), and others, been secretly and unlawfully diverting Norca's principal supplier and taking other unlawful steps to compete against Norca, ultimately forming a company named "Primrose Metals, Inc."and subsequently "Primrose Alloys, Inc." to do so. This unlawful activity of Wren included, for example:

- conspiring with Norca's agent in Asia (Song) for months and together secretly diverting Norca's relationship with its most important and exclusive vendor (Changwon in Korea), as well as its other vendors, for their new venture;

- disclosing Norca's trade secrets and confidential and proprietary information to third parties for use in their new venture ;

- diverting orders from Norca for their new venture;

- changing the telephone service from Norca's name to Wren's and then lying to Norca why he had done so;

- secretly traveling with an unauthorized third party to visit Norca accounts for the purpose of promoting their new venture;

- instructing Norca's agent (Song) to lie to Norca's president about his activities; and

- deliberately excluding Norca's president from Wren's trips to visit suppliers, so that Wren and Song could promote their new business while Wren was still employed by Norca.

Realizing they had been caught, defendants quickly unleashed the trojan horse. Within the following two days, defendants and others (as yet unidentified) incorporated Primrose Metals, Inc. ("Primrose") and registered the website www.primrosemetals.com (which they launched shortly thereafter), and Song terminated his 10-year relationship with Norca.

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY  - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

1

As it turned out this was only the beginning. When Norca terminated Wren's employment on June 12th, the very next day defendants e-mailed an announcement on Primrose letterhead to all of Norca's confidential list of customers and suppliers soliciting their business. The announcement falsely stated that Primrose has "replaced" Norca, falsely referred to Norca's customer's as Wren's and fraudulently listed as the telephone and fax numbers for Primrose the same numbers which Norca used and paid for (with Wren now answering Norca's phone "Bob Wren's office" instead of "Norca"). Defendants's website falsely listed those same telephone/fax numbers, and also plagiarzed substantial text from Norca's website. That same day, the only other Norca employee in the Burlingame office quit (Victoria Picolotti) and immediately joined Primrose.

Equally astounding, Norca discovered that Wren (while still employed by Norca) had diverted a request for quotation from one of Norca's major clients on a potential $3MM+ order and that his new company (Primrose) had instead quoted on it. To make matters worse, Wren/Primrose had done so using a manufacturer's quote obtained from Norca's principal supplier (Changwon in Korea), which up to that time had been operating under an exclusivity arrangement with Norca. The ramifications of this interference with Norca's principal supplier are potentially devastating.

The sheer magnitude of defendants' unlawful steps taken to compete *while Wren was still employed by Norca* are evidenced by Primrose's own industry announcements and ads. Within one week of Wren's termination, Primrose was representing that it already had four offices (San Francisco, Colorado, Korea and China) and eight employees, was already representing mills (which generally takes weeks and months to accomplish), already had the capacity to finance the mills' entire production and was "poised to grow exponentially in 2007 and 2008."

On June 29th, Norca filed this action for trade secret misappropriation, unfair competition, breach of fiduciary duty and intentional interference against defendants Wren, Primrose Metals, Inc., Richard Raybin, Lifetime Capital Group and Victoria Picolotti (collectively referred to as "defendants"). Over the intervening weekend, Wren's counsel informed plaintiff that Wren has

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

2

purportedly left Primrose Metals, Inc. and has now formed a new entity (Primrose Alloys, Inc.), presumably housed in the same office space. Plaintiff anticipates amending the complaint herein to add additional defendants, including, e.g., Primrose Alloys, Inc. and Wren's financier(s) and other conspirators (once identified).

Norca hereby seeks immediate temporary and preliminary injunctive relief to prevent defendants, two of whom are former Norca employees and those acting in concert with them, and including Wren's purported new company, Primrose Alloys, Inc., from, *inter alia*, continuing to: interfere with Norca's exclusivity arrangement with it principal and critical supplier (Changwon), misappropriate Norca's trade secret and confidential proprietary information, and unfairly compete with Norca. There is no doubt that defendants' conduct violated California law nor that Norca is likely to succeed on the merits of its claims.

Absent the requested injunctive relief, Norca will continue to suffer irreparable harm. Norca faces imminent danger of losing and/or having its long-established customer and supplier relationships as well as its trade secrets and other confidential proprietary information permanently damaged, all of which Norca has invested years of resources and energy developing and are crucial to Norca's being able to compete in this industry. In particular, Norca's exclusivity arrangement with the Changwon mill is pivitol to its boiler tube business. Further interference on defendants' part will in all likelihood permanently damage Norca's position in the marketplace. Unless defendants and their co-conspirators are enjoined from further trade secret misappropriation, Norca will be irreparably harmed since once that information is revealed it is impossible to "unring the bell." Defendants' false and misleading advertising and other anti-competitive activities (such as claiming to have replaced Norca, plagiarizing Norca's website and stealing Norca's telephone and fax numbers) will wreak havoc in the marketplace unless enjoined. This irreparable harm is compounded by the fact that many key witnesses - such as Norca's suppliers, their intermediaries and Wren's accomplice (Song), are located in Asia, making it difficult to compel their testimony and obtain documents. Further, given that Primrose is a start-up, Norca faces serious risk that any damage award here would be uncollectible.

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

3

Finally, Norca requests leave to conduct expedited discovery. Immediate discovery is necessary for plaintiff fully to prepare and present evidence for a preliminary injunction hearing, and to determine, *inter alia,* the scope of defendants' unlawful conduct and misappropriation of trade secret and confidential information, to identity all persons involved in the scheme (so they can be enjoined and added as defendants at an early stage) and to determine the extent of defendants' interference with plaintiff's suppliers and customers so that Norca can attempt to mitigate its damages.

## II. STATEMENT OF FACTS

NORCA is engaged in selling specialized "boiler tubes" ordered for customer specifications in the power generation business, and selling through distributors industrial pipes, tubing, valves, fittings and flanges. NORCA is one of North America's leading providers of these products. Declaration of Norca's president, Selim Bahar ("Bahar Decl.") ¶3. The claims in this case primarily relate to the boiler tube business. Given that boiler tubes are used to construct or refurbish large power generation facilities, each order often ranges between $1Million - $3.5 Million. Id., ¶2.

### A. Norca's "Boiler Tube" Business

The "boiler tube" business is complex and the barriers to entry are substantial. Norca contracts with a foreign manufacturer to have the boiler tubes specially manufactured to the customer's specifications (most of which are different) and then imports the tubes to the United States or elsewhere for sale and delivery to the customer.[1] This involves, for example, foreign manufacturers, foreign and domestic buyers, substantial capital and financing requirements (since Norca purchases the goods), and a myriad of logistical problems such as foreign quality control,

---

[1]Once Norca receives a "request for quotation" ("RFQ") for boiler tubes from a potential customer, it typically contacts its principal supplier located in Asia (with whom it has an exclusive relationship - see below) and obtains a manufacturing quote(s) to the specifications required by the particular order. Norca analyzes the quote(s), formulates pricing and submits a quote to the customer. On acceptance, Norca contracts with the manufacturer and imports the goods when finished. Bahar Decl., ¶¶4-5.

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

4

customs, shipping and international insurance. It also requires substantial expertise and having established, long-term relationships with a network of manufacturers (and their intermediaries) located in Asia, customers and other providers (e.g., insurance companies, banks, shippers, freight forwarders, customs brokers). Bahar Decl. ¶¶4-5. Norca bears the potential risk that a customer will default on payment for multi-million dollar order(s). Bahar Decl. ¶5.

**B. The Critical Changwon Mill**

Norca's principal manufacturer for boiler tubes is and at all times was a company named "Changwon" located in Korea. The Changwon mill is owned by a Korean company (Posco) and is represented by a Korean export agent (Posteel).[2] Until the recent actions of defendants as described below, Norca was the exclusive representative for Changwon to Norca's U.S. based customers for delivery to their worldwide fabrication facilities. This type of arrangement is a standard practice followed by Korean mills. Norca, Changwon and Posteel personnel frequently visited Norca customers together to market Norca's boiler tube products. For example, when a Norca customer previously attempted to deal directly with Changwon, Changwon refused and informed the customer that Norca was its exclusive representative. Bahar Decl. ¶6.

**C. Norca's Trade Secret and Confidential Proprietary Information**

Norca's success and profitability is dependent in significant part upon maintaining the confidentiality of its trade secrets and proprietary information. Bahar Decl. ¶7. This includes, for example and without limitation, the following:

- Norca's pricing information, pricing strategies, pricing formulation methods and profit margins. Bahar Decl. ¶7(a).
- Norca's proprietary credit insurance program. (This credit insurance program was developed to allow Norca to transact business with potential customers which Norca deems to be credit risks to guard against the possibility that those customers will default on their payment obligations. This program was extremely difficult to obtain, is unique to the industry, is very complicated and took months to negotiate.) Bahar Decl. ¶7(b)

---

[2] Changwon recently changed its name to "Posco Specialty Steel Co. Ltd."

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

5

- The identity of the complete list of manufacturing facilities used by Norca and the specific contact person at each; the identities of the intermediaries used by Norca to contact and negotiate with each such facility and the specific contact person for each; the credit, payment terms, shipping, insurance and other requirements demanded or accepted by each such facility; and Norca's evaluation of the expertise, competence and reliability of each facility to manufacture particular types of products to specification in a timely fashion. Bahar Decl. ¶7(c).
- The identity of Norca's customers and the specific contact names for each, the product specifications and requirements for each and Norca's working knowledge of the decision-making process for each customer. Bahar Decl. ¶7(d).
- Norca's proprietary software, which contains, among other things, Norca's entire "trading package" with respect to the non-boiler tube business. (This proprietary software has been developed by Norca over more than 20 years and is updated from time to time. It is used by Norca to, among other things, analyze worldwide supplier and market information and formulate quotes on its broad distributor line of products.) Bahar Decl. ¶7(e).

It has taken years and substantial resources for Norca to develop the above information and these relationships, which permit Norca to operate quickly, effectively and competitively in the marketplace. Bahar Decl. ¶7(e). This information is not known to the general public nor within this industry. Norca has at all times taken reasonable steps to ensure the secrecy of such trade secret and proprietary and confidential information. Norca limits the disclosure of such information to its sales personnel, which total less than ten persons. Norca has not shared, and does not share, such information with persons or entities outside of Norca. Bahar Decl. ¶8.

**D. <u>Robert Wren</u>**

Beginning in approximately 1998, Norca hired defendant Robert Wren ("Wren") as a vice president to sell products on behalf of Norca to Norca's customers. Bahar Decl. ¶9. Wren reported to Norca's president, Selim Bahar ("Bahar"). Because Wren resided in Burlingame, California, for convenience sake SVF, a Norca affiliate, opened a small two person office located at 330 Primrose Road, Suite 508, in Burlingame, California for Wren and one other Norca

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd
6

employee to work from. As part of his Norca sales duties, Wren primarily worked with one particular buying agent, Steve Song (hereafter "Song"), who was associated with Norca and located in South Korea. Song, on behalf of Norca, primarily interacted with manufacturers, their agents and other intermediaries located in Asia, with whom Norca had excellent working and often long-term relationships. These contacts principally included Changwon, through its owner (Postco) and export agent (Posteel), with whom Norca had an exclusive relationship. Bahar Decl. ¶¶6, 10.

As part of his employment, Wren had access to and frequently employed the Norca trade secrets and confidential and proprietary information identified above. Wren was directly and integrally involved in determining Norca's pricing guidelines, strategies, formulations and profit margins. He was linked into Norca's computer system in New York, was knowledgeable about Norca's proprietary software (located on the system) and was involved in a major contemplated upgrade of that software, having had frequent conversations with Norca's president on this project in 2007. Wren was likewise knowledgeable about Norca's credit insurance program, and was intimately familiar with Norca's confidential and proprietary supplier and customer information. Bahar Decl. ¶11.

Wren, acting together with Song, became very successful in generating sales for Norca, primarily in the boiler tube business. By 2006, Wren and Song were primarily responsible for generating for Norca annual sales totaling tens of millions of dollars. Bahar Decl. ¶12. Given this success, in or about late 2006, Wren was promoted to Executive Vice President of Norca. As part of this promotion, Wren agreed to move to the New York office with the understanding that, assuming the transition went smoothly, in a relatively short period of time he would take over management of all Norca business operations and administration. Although Wren came to New York on several occasions in or about early 2007 to house hunt and begin this transition, he subsequently began dragging his feet in moving forward. Bahar Decl. ¶13.

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

7

**E. Wren's Suspicious Behavior**

By Spring 2007, Wren had begun acting strangely. He became uncharacteristically guarded in his conversations with Norca's president (Bahar) concerning his [Wren's] and Song's business activities and business prospects for Norca. Bahar Decl. ¶14(a)

In May 2007, Norca discovered that the telephone bill for Norca's Burlingame office was no longer being sent by the telephone company to Norca in New York (as had always previously been done), but instead was now addressed and being sent to Wren individually. When Norca asked Wren about this, he shrugged it off and said it must have been a mistake. Bahar Decl. ¶14(b), Exhs. A-B. (This turned out to be a lie. Following Wren's departure set forth below, Norca learned that on April 11th, Wren had personally contacted the phone company and directed that the billing name and address on the bill be changed from "Norca Industrial Co., 185 Great Neck Road, Great Neck, NY 11021" to "Robert Wren, 330 Primrose Rd., Suite 508, Burlingame, CA 94010.") *Id.*

Norca also discovered, in reviewing Wren's expense reports, that he had paid for two car spaces at one hotel and two hotel breakfasts on one morning, suggesting that he had traveled with an unauthorized third party in visiting Norca customer accounts. When asked about this matter, Wren became defensive, hostile, offered no explanation and directed that those additional charges be deleted. Bahar Decl. ¶14(d), Ex. C.

**F. The Scheme Is Uncovered**

As a result of Wren's suspicious behavior, on June 6, 2007, Norca accessed the company's computer server located at Norca's office in New York and reviewed Wren's emails located on that server. Bahar Decl. ¶15. In reading those e-mails, Norca was shocked to discover, *inter alia*, that Wren, Song and others had for months been secretly soliciting Norca's principal supplier and actively taking other improper actions to compete with Norca, that Wren had disclosed trade secret/confidential information to a third party for that purpose and that Wren had directed Song to lie to Bahar. For example:

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

8

**1. The "You and Me" Emails.**

Beginning in at least December 2006 through May 30, 2007, Wren and Song sent approximately thirty (30) e-mails to each other containing the "subject" heading "You and Me" or its abbreviation ("Y and M"). Bahar Decl. ¶15(a). On December 18, 2006, Wren and Song exchanged "you and me" emails concerning Norca's relationship with its principal supplier (Changwon of Korea), and Wren cautioned Song: "Please keep to you and me and let's discuss." Bahar Decl. ¶15(a), Ex. D. The meaning of this phrase was subsequently spelled out in a "you and me" e-mail sent by Wren to Song on March 28, 2007, stating "We (you and me) will have our own company one day. I am sure. Be patient." Bahar Decl. ¶15(a), Ex. E. Song immediately replied: "If you go, I go. I will always be with you." Id. The following day Wren replied "This is You and Me." Bahar Decl. ¶15(a), Ex. F.

**2. The Scheme.**

Wren detailed this plan in an email to Song dated March 30th, stating that he intended to start a competing company using Changwon (*i.e.*, Norca's principal and exclusive supplier) as the "key" (Bahar Decl. ¶15(b), Ex. E):

> **"My plan is to build a business through South Korea to all of Asia. Add assistants under you (for example, Chinese speaking) and let you control all of Asia. Then I add sales people in America and focus on S. Korea. I am working on this plan. Boiler business is the base. *Changwon is key.* All efforts and full emphasis on Korea. Long term investments in key mills identified by you. *You and I take ownership in the company.* So as we build and pay employees we actually have something for our children long term. (emphasis added.)"**

In a followup e-mail dated April 1st, Wren acknowledged that the venture had gone past the planning stage: "*I am remodeling all our current suppliers in Korea* and thinking to find the new sources in China that possible can be changed from [Norca's agent's] current suppliers." (*Id.*) Both of these e-mails were headed "You and Me." *Id.* (emphasis added).

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

9

On March 27th, Norca received a new order from a customer, which was forwarded to Wren. That same day, Wren wrote an e-mail to Song headed "New Order #[redacted] you and me" (presumably intending to involve that order in his new venture). Wren stated that he was giving Song a specified commission rate, and instructed Song not to tell Norca's president (Bahar) about it. Wren also urged: "Please keep thinking about building a long term business in Korea and China through you" and again instructed Song: "do not mention to [Bahar]." Bahar Decl., ¶15(c), Ex. E.

**3. Financing For The Scheme.**

On April 5th, Wren sent an email asking Song to identify "1-2 very good South Korean Banks," preceded by "You and Me" in the text. (Bahar Decl., ¶15(d), Ex. G). When Song did so the following day, Wren replied that: "The idea is to set up financing through a Korean bank in order to best present ourselves (y[ou] and m[e] as owners) to Posco [*i.e.*, Changwon - Norca's principal supplier] and other Korean makers. I have a financial guys (sic) and I am working for our kids." (*Id.*) Each of these emails contained the subject header abbreviation: "Y and M." *Id.*

**4. Disclosure of Norca's Trade Secrets.**

On April 5, 2007, Wren forwarded Song's e-mail identifying these banks to a third party (Richard Raybin at rrabin@flcg.com), stating "FYI." Bahar Decl., ¶15(e), Ex. H; Declaration of Counsel, ¶¶2-3, Exs. A-B. That same day, Wren also sent Richard Rabin a highly confidential Norca document containing a summary of Norca's credit insurance program described in Section IIC above. Bahar Decl., ¶15(f), Ex. I. This summary details Norca's credit insurance program and the terms of its credit insurance for one of Norca's principal customers. Bahar Decl., ¶15(f). This was a confidential, unique and difficult credit insurance arrangement to procure and took months to do so. *Id.* Wren was not authorized to disclose this information to a third party. Id.

**5. Wren Seeks To Exclude Norca's President From Visits to Suppliers.**

Given the importance of Norca's relationships with its suppliers (principally Changwon), Norca's president (Bahar) typically accompanied Wren and Song on visits to suppliers. In an April 9th email headed "Y and M", however, Wren told Song that he did not

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

10

want Bahar to join them on upcoming supplier visits and therefore intended to book them at a time when Bahar was busy or on vacation (Bahar Decl., ¶15(g), Ex. J). (This was obviously so they could, while ostensibly traveling for Norca on business, recruit additional manufacturers for their new venture.)

**6. Wren Targets Additional Suppliers.**

A week later, Song and Wren exchanged emails headed "You and Me," outlining additional manufacturers they intended to recruit for their new venture. Bahar Decl., ¶15(h), Ex. K.

**7. Wren/Song Refuse to Cooperate With One Of Norca's Suppliers.**

On May 29th, in response to Bahar's direction that Wren provide quotes to a customer for its new plant, Song told Wren: "Let's not cooperate [with one of Norca's established intermediaries for a major supplier]." There was no legitimate business reason for Wren to refuse to do so. Bahar Decl., ¶15(I), Ex. L.

**G. This Shocking Discovery Accelerates Defendants' Scheme**

In response to these shocking revelations, that same day (June 6th) Norca demanded that Wren and Song immediately meet with Norca management in New York (without specifically saying why). Bahar Decl., ¶16. Song gave excuses not to do so and Wren initially agreed but then cancelled. *Id.* No doubt realizing their scheme had been unearthed, defendants put their scheme into overdrive. Within the next two days: defendants (through Raybin's company "Lifetime Capital Group") registered the internet domain name www.primrosemetals.com. (on June 6th) and launched that website shortly thereafter; Song severed his 10-year relationship with Norca (on June 7th); and defendants and other as yet unidentified persons incorporated a California entity named "Primrose Metals, Inc."[3] ("Primrose") (on June 8th). Bahar Decl., ¶¶16-17; Counsel Decl., ¶¶4, Ex. C. Starting on or about June 11th, Wren unilaterally changed the voice mail announcement on the Norca Burlingame office telephone to "You have reached Bob

---

[3] Not coincidentally, the Norca office is located on Primrose Ave in Burlingame. Bahar Decl., ¶21.

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

11

Wren's office" rather than the usual "You have reached Norca Industrial Company." Bahar Decl., ¶18.

**H. Norca Terminates Wren's Employment.**

On June 12th, Norca terminated Wren's employment. Bahar Decl., ¶19, Ex. M.. That same day, defendant Victoria Picolotti, the only other Norca employee who worked at the Burlingame office, announced she was quitting and immediately joined defendants' new company (Primrose). Bahar Decl., ¶¶20, 27, Exs. N, U.

**I. Defendants Unleash Their Trojan Horse**

Within 24 hours following Wren's termination, defendants sent an announcement by e-mail to one of Norca's principal export agents (and presumably to all other companies and persons on Norca's confidential list of suppliers and customers) on PRIMROSE letterhead headed: *"Primrose Metals replaces NORCA Industrial Company"* (emphasis added). Bahar Decl., ¶¶21-22(a), Ex. O. The announcement:

- falsely represented that "Bob Wren is pleased to announce that Primrose Metals has replaced Norca Industrial Company in providing financial, operating and logistical support to his customers and suppliers," when in fact the customers and suppliers belonged to Norca, not Wren, and Primrose had not "replaced" Norca (Bahar Decl., ¶22(a));
- falsely stated that the telephone and fax numbers of Primrose were (650) 344-3291 and (650) 344-9241, respectively, which were the telephone and fax numbers for Norca's Burlingame office and which bills were paid for by Norca (Bahar Decl., ¶22(b)[4];
- represented that Primrose was already representing mills, already had "the capacity to finance the [mill's] entire production with competitive terms and timely payments," was already carrying a "broad range of insurance and provides other financial arrangements to bridge the risks of international trade," and already "has the capital to finance our purchases

[4] This laid bare why Wren had secretly switched the phone bill to his own name. The announcement also listed the address for Primrose to be in the same Burlingame office building as Norca, but a different suite number, obviously adding to the intended confusion. Bahar Decl., ¶22(b).

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

12

[and], the systems and staff to provide state-of the art customer service"(Bahar Decl., ¶22(c)); and

- represented that Primrose had the capability "to match or exceed the terms offered by other trading firm," evidencing defendants' intent further to use Norca's confidential and proprietary or trade secret information since it is generally not known what sales terms are offered by other trading firms (Bahar Decl., ¶22(d).

Defendants thereafter issued a second announcement, which contained many of these same representations, stated that Wren had joined Primrose as Vice President of Sales and again listed the telephone and fax numbers for Primrose which belonged to Norca. Bahar Decl., ¶23, Ex. P.

Both announcements listed the website for Primrose as: www.primrosemetals.com. This website likewise fraudulently listed the telephone and fax numbers for Primrose which belonged to Norca. Bahar Decl., ¶24(a). Ex. Q. Defendants also plagiarized verbatim and/or in substantially similar form a majority of the text appearing on the norca.com website (owned by Norca) directly onto the Primrose website. Bahar Decl., ¶24(b), Exs., R-S.[5]

**J. The True Magnitude of Defendants' Unlawful Scheme Is Becomes Evident.**

On June 18th, less than one week after Wren was terminated, Primrose began advertising for a "Corporate Controller" on the internet. The advertisement represented that, *inter alia*, Primrose is a "heavily funded start-up metals trading company, with offices in SF, Colorado, Korea and Shanghai," that it has eight employees and that it is "poised to grow exponentially during 2007 and 2008." Decl., ¶27, Ex. U. The representations in this ad and the earlier announcements, if true, reveal the shocking magnitude of Wren's unlawful activities to compete against Norca while still employed by Norca. Given the barriers to entry in this business, it would not have been possible to achieve this magnitude of operation, nor even start representing any manufacturers at all, on a weeks' notice, *unless* defendants had already had *weeks - if not*

[5] The language on the norca.com website has been there for years. Norca has spent substantial resources in developing/maintaining its site. Bahar Decl., ¶24(b).

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

*months* - of advance preparation and active discussions/solicitations with potential suppliers, customers and vendors - all while Wren was still employed by Norca. Bahar Decl., ¶¶22(c), 27. *Id.*[6]

**K. Diverted Orders**

In mid-June, Norca further discovered that Wren, while employed by Norca, had failed to disclose a request for quotation ("RFQ") from a customer, usurped it for his new venture and shortly thereafter submitted a quote on behalf of Primrose (in the range of $3.0-$3.5 Million). Bahar Decl., ¶25. Specifically, on June 12th, Norca's New York office discovered that one of its long-standing customers had issued an RFQ on a project on June 1st with a June 11th deadline to respond. *Id.* Although this RFQ had been sent to Wren on June 1st, he never disclosed it to any Norca official. When Norca found out, it immediately submitted a late quote to this customer. *Id.* The customer then told Norca that Primrose had already submitted a quote from Norca's principal manufacturer (Changwon) and that Primrose's quote was 9% lower than Norca's. *Id.*)[7] Declaration of Robert Blumenkrantz, ¶¶1-6, Ex. A.

The disclosure that Primrose had obtained a quote from Norca's principal supplier (Changwon) was shocking. Norca was the exclusive representative for Chanwong to Norca's U.S. based customers for delivery to their world wide fabrication facilities. Bahar Decl., ¶25(c). Wren himself, and Changwon's owner and agent, had all ackowledged this fact on many occasions. *Id.* The securing of this quote necessarily meant that Wren had been having on-going

---

[6] Manufacturers (even if they know an individual personally) will require details about a new trader's financial backing and wherewithal, and need to have it approved, before they will agree to have a trader start representing them or before they provide a quote to him or her. This process takes weeks, if not months. Bahar Decl., ¶22(c).

[7] Given the significant differential, Wren likely underbid this RFQ to get the business and establish a toe-hold for Primrose in the industry and drive business away from Norca, and likely used his knowledge of Norca's confidential pricing structures, strategies and information in formulating this quote. *Id.* Bahar Decl., ¶25(b).

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

14

discussions with Changwon or its representatives about his new venture for weeks or months - all while he was employed by Norca.[8] *Id.*

**L. The Need for Injunctive Relief**

A temporary restraining order and preliminary injunction against defendants, and their agents, employees and persons acting in concert with them (now also to include Primrose Alloys, Inc.), are necessary to avoid further irreparable harm to Norca for the following reasons:

*First*, these actors should be restrained from contacting, obtaining quotes, contracting with, accepting deliveries from or doing business with Changwon (now "Posco Specialty Steel Co. Ltd.") directly or through intermediaries. Bahar Decl. ¶29(a). While employed by Norca, Wren conspired with Norca's agent in Asia (Song) for months and together secretly diverting Norca's relationship with its most important and exclusive vendor (Changwon in Korea), as well as its other vendors, for their new venture. Wren's emails confirm that he was specifically targeting Changwon ("Changwon is key") in order to start up his competing business. Bahar Decl., ¶15b, Ex. E. Absent a restraining order, this critical relationship with Changwon will be further disrupted and cause further irreparable harm to Norca. It also may be difficult to prove the damages caused by such disruption, especially since Changwon, its intermediaries, Song and other persons residing overseas will almost certainly be witnesses, and it will likely be difficult to compel them to testify in this action or to produce documents. Bahar Decl., ¶29a. Norca also faces a serious risk that any judgment for damages will be uncollectible. Primrose Metals, Inc. is a startup and Wren does not appear to have the financial wherewithal to pay a significant damage award. *Id.*

*Second*, these actors should be restrained from further disclosing and/or using Norca's trade secrets and proprietary and confidential information identified in Section II C above. Norca has spent years and substantial resources developing its pricing information and strategies, its

---

[8] Based on several e-mails sent during the first week of June 2007, it also appears that Wren may have diverted, or attempted to divert, a potential Norca order to a competitor in Petaluma, California. Bahar Decl., ¶ 26, Ex. T.

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

15

insurance credit program, its proprietary software with its entire "trading package" and in establishing and maintaining its confidential list of Asian suppliers (and their intermediaries), customers and vendors (Bahar Decl, ¶29(b)) and their manufacturer- and customer- specific information. The foregoing are key to Norca remaining competitive in the marketplace. Absent the requested injunctive relief, defendants will reap an unfair and substantial competitive advantage over Norca, which will irreparably injure Norca. The full extent of the substantial harm which Norca would suffer by such use and/or dissemination may be difficult to prove, especially given that many of the witnesses and documents are located overseas. *Id.*

*Third*, these actors should be restrained from contacting the companies on Norca's confidential list of customers and suppliers. Defendants have already sent out announcements to Norca's customers and suppliers announcing not only that Wren is now working for a competitor, but soliciting their business using a variety of misrepresentations. Bahar Decl., ¶29(c).

*Fourth*, these actors should be restrained from quoting, or entering into contracts, based on requests for quotes received during Wren's employment with Norca. Absent the requested injunctive relief, Norca faces the likelihood of both losing the business and then being left with an uncollectible judgment. Bahar Decl., ¶29(d).

*Fifth*, these actors should be enjoined from using the telephone and facsimile numbers used by Norca or representing that these numbers belong to defendants; from continuing to represent that Primrose has "replaced" Norca and that Norca's suppliers and customers are defendants'; and from continuing to use language directly copied from Norca's website onto defendants' own website. Absent such relief, this type of conduct will continue to sow confusion in the marketplace and put Norca at a competitive disadvantage. Bahar Decl., ¶29(e). Plaintiff's resulting damages may be difficult to prove, especially since, again, many of the witnesses reside overseas. *Id.*

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

16

*Finally*, defendants should be enjoined from disposing or destroying any evidence of their solicitation or servicing of Norca's suppliers or customers or other use of Norca's trade secrets or proprietary information.

## III. NORCA HAS SATISFIED THE REQUIREMENTS FOR ISSUANCE OF INJUNCTIVE RELIEF

### A. The Ninth Circuit Standard for Issuance of Preliminary Injunctive Relief

In the Ninth Circuit, injunctive relief is appropriate when the moving party can satisfy one of two legal standards. Under the traditional standard, the moving party must show: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to plaintiff if such relief is not granted; (3) a balance of hardships favoring the plaintiff; and (4) granting the injunction will serve the public interest. *See Stanley v. University of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994); *Southwest Voter Registration Education Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003). Alternatively, a preliminary injunction is also appropriate if the moving party demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips strongly in favor of the moving party. *Stanley*, *supra*, 13 F.3d at 1319.

As set forth below, Norca will likely prevail on the merits of its claims. The conduct Norca seeks to enjoin violates both statutory and common law, and will cause and continue to cause irreparable injury to Norca. Monetary compensation for this injury would be difficult to ascertain and provide inadequate relief to Norca. The Court should therefore grant Norca's request for a temporary restraining order, thereby preserving the *status quo* until arguments can be heard concerning Norca's request for a permanent injunction.[9]

---

[9] The emergency nature of actions for TROs and preliminary injunctive relief often makes it difficult to obtain affidavits from persons who would be competent to testify at trial. Accordingly, the Court has discretion to consider hearsay evidence: "The trial court may give even inadmissible evidence some weight when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. V. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("[T]he Federal Rules of Evidence do not apply to preliminary injunction hearings.")

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

17

**B. Norca Is Likely to Succeed On The Merits of Its Claims for Relief**

To obtain a TRO or preliminary injunction, a plaintiff must show a likelihood of prevailing on the merits. *Wilson v. Watt,* 703 F.2d 395 (9th Cir. 1983). A plaintiff, however, need not show it will positively prevail on the merits. *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991). A reasonable probability or "fair chance" of success is the standard for granting preliminary injunctive relief. *Berda v. Grand Lodge of IAM,* 584 F.2d 308, 315 (9th Cir. 1978). Given the overwhelming evidence before this Court, Norca can, at a minimum, demonstrate a reasonable probability of success on each of its claims.

**1. Trade Secret Claims**

The evidence demonstrates that defendants misappropriated Norca's trade secrets. Under the Uniform Trade Secret Act ("UTSA"), adopted by California at Cal. Civ. Code Section 3426, *et. seq.*, a trade secret is information that (1) derives independent economic value, actual or potential, from not being generally known to the public or to the other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code. § 3426.1(d).

Norca's trade secret information is set forth, *supra,* at Section IIC, including, e.g., pricing-related and profit information, Norca's proprietary credit insurance program, Norca's complete list of manufacturers and manufacturer-related information, the identity of Norca's customers and customer-related information and Norca's proprietary software containing Norca's entire "trading package." This information derives independent economic value as a result of its not being known to the general public or to others within the industry. Bahar Decl. ¶8. Norca has spent years and significant company resources to develop, establish and maintain the information, materials and relationships, which are not known to the general public nor within the industry. Its secrecy enables Norca to be highly competitive in the marketplace. *Id.* Norca has at all times taken reasonable steps to ensure the secrecy of this trade secret and proprietary and confidential information. *Id.* Norca limits the disclosure of such information to its sales personnel, which total less than ten persons.

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

18

Here, there is direct evidence that defendants have misappropriated Norca's trade secrets. On April 5, 2007, Wren emailed defendant Richard Raybin a highly confidential Norca document containing a summary of Norca's proprietary credit insurance program. Bahar Decl. ¶15(f), Ex. I. This document details both the program itself as well as its application for one of Norca's principal customers, and is a very unique and difficult credit arrangement, into which Norca invested months of work. *Id.* See Cal Civ. Code § 3426.1(b) [misappropriation occurs by receipt of trade secret by someone who knew or had reason to know it was acquired by improper means or derived from a person who owed a duty to keep it secret]. [10]

Given that Wren has already demonstrated his willingness to disclose Norca's trade secrets and confidential information, Norca faces imminent danger of losing its trade secrets unless defendants are enjoined from further misappropriation. The Court may enjoin both threatened and actual misappropriation of trade secrets. Cal. Civ. Code § 3426.2(a); *Imi-Tech Co. v. Gaaliani*, 691 F. Supp. 214 (S.D. Cal. 1986) (preliminary injunction granted to prevent threatened disclosure of trade secret information obtained from the plaintiff's former employees). The confidentiality of trade secrets here will be irrevocably compromised and Norca will suffer irreparable injury unless the Court intervenes and grants injunctive relief.

**2. Unfair Competition Claim**

Defendants' actions constitute unfair competition. *See* California Business and Professions Code § 17200 (unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising); *See also Courtesy Temporary Service, Inc.*, 222 Cal. App. 3d 1278, 1292 ("[i]ndeed, the cases are legion holding that a former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers, is regarded as unfair competition"). California's unfair competition laws allow injunctive relief on these facts. *See Cortez v. Purolator Air Filtration Products Co.,* 23 Cal. 4th 163, 173-174 (2000)

---

[10] "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* at § 3426.1(a).

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

19

("[Section 17203] authorizes the court to fashion remedies to prevent, deter, and compensate for unfair business practices").

Defendants' unlawful, unfair and fraudulent business practices include, *inter alia*, (1) soliciting and diverting Norca's exclusive relationship with its principal supplier (Changon), while Wren was still employed by Norca; (2) using Norca's trade secrets and confidential and proprietary business information to compete against Norca; (3) fraudulently switching Norca's telephone and fax numbers (which were paid for by Norca) from Norca to Wren; (4) fraudulently listing Norca's telephone and fax numbers as belonging to Primrose in announcements and on the Primrose website and changing the voice message on the Norca telephone to "You have reached Bob Wren's office"; (5) falsely announcing that Primrose Metals has "replaced" Norca and falsely referring to Norca's customers and suppliers as Wren's; (6) diverting a $3MM+ RFQ received from a Norca customer to Primrose and then having Primrose quote on it; and (7) soliciting companies on plaintiff's confidential customer and supplier lists. Unless restrained and enjoined, defendants will continue to engage in these or similar types of unlawful business actions and Norca will be irreparably harmed as a result.

**3. <u>Breach of Fiduciary Duty and Breach of Loyalty Claims</u>**

An employee owes a duty of loyalty to his employer and must act only in that employer's best interest. *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 ("[a]n employer has the right to expect the undivided loyalty of its employees"). This duty is breached "when the employee takes action which is inimical to the best interests of the employer." *Ibid.* Further, as a vice-president of Norca, Wren owed Norca a fiduciary duty to act in its best interests and refrain from doing anything that would cause injury to Norca or deprive Norca of opportunities. *See Bancroft-Whitney v. Glen*, 64 Cal. 2d 327, 345 (1966).

The evidence demonstrates that Wren, in concert with defendants Primrose, Raybin, LTG and others, breached his fiduciary and loyalty duties to Norca by, *in addition to the evidence cited in Section IIIB2 above* and without limitation, (1) purposefully scheduling visits to suppliers at times when Norca's president would be unable to accompany him; (2) instructing Norca's agent

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

20

(Song) to lie and hide information from Norca's president; and (3) traveling to customer accounts with an unauthorized third party for the purpose of promoting their new venture.

Defendants' conduct went beyond preparing to compete with Norca and crossed the line into active solicitation and breach of duties. *Huong Que, Inc. v. Luu,* 150 Cal.App.4th 400, 417 (2007) (even assuming defendants were entitled to participate in the formation of a competing business and to plan eventual employment with that entity, they would still breach a duty of loyalty by "diverting plaintiffs' customers to that competing business while ostensibly remaining plaintiffs' employees or agents"); *Eckard Brandes, Inc. v. Riley,* 338 F.3d 1082, 1086 (9th Cir. 2003) (former employees breached duty of loyalty when they formed a competing partnership and submitted a bid for a contract against their employer).

**4. <u>Intentional Interference Claims</u>**

Norca's success depends upon its established relationships with agents and manufacturers throughout the world. Norca's most important economic relationship is its exclusive arrangement with the Changwon mill, located in Korea. Bahar Dec., ¶6. Changwon is Norca's principal manufacturer for boiler tubes. *Id.* Until defendants' wrongful actions, Norca had been the exclusive representative for Changwon to Norca's U.S. based customers. *Id.* Norca, Changwon and Posteel personnel frequently visited Norca customers together to market Norca's boiler tube products. *Id.* Wren himself, and Changwon's owner and agent, had all acknowledged this fact on many occasions. Bahar Dec., ¶25c. Changwon had previously rebuffed a Norca customer's attempt to deal directly with Changwon, informing that customer that Norca was Changwon's exclusive representative. Bahar Dec., ¶6.

Defendants Wren, Primrose, Raybin and LTG were aware of both the existence and value of Norca's exclusive relationship with Changwon and intentionally set out to destroy it. This

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

21

intention was evidenced in an email Wren wrote while still employed by Norca (and on Norca's email system):

> "My plan is to build a business through South Korea to all of Asia. Add assistants under you (for example, Chinese speaking) and let you control all of Asia. Then I add sales people in America and focus on S. Korea. I am working on this plan. Boiler business is the base. **Changwon is key**. All efforts and full emphasis on Korea. Long term investments in key mills identified by you. You and I take ownership in the company. So as we build and pay employees we actually have something for our children long term."

Bahar Decl., ¶15(b), Ex. E (emphasis added). Unless defendants are enjoined from further targeting Norca's key suppliers and attempting to destroy Norca's business relationships, Norca will suffer substantial and irreparable injury. *See Ernst & Ernst v. Carlson,* 195 Cal. 2d 45, 50 (former employee properly enjoined from making various attempts to discredit the employer accounting firm's handling of its client.).

In addition to interfering with Norca's established business agreement with Changwon, defendants are also interfering with Norca's future contracts with its customers and suppliers. As discussed above, defendants have intentionally lured and are continuing to lure Norca's customers and suppliers to do business with Primrose instead of Norca by using Norca's trade secrets and confidential proprietary information, and otherwise unfairly and otherwise unlawfully and unfairly competing with Norca. Norca is therefore likely to succeed on the merits of its claim for intentional interference with prospective economic advantage. *See Lowell v. Mother's Cake & Cookie Co.,* 79 Cal. 3d 13 (1978).

**C. <u>Irreparable Harm and Lack of an Adequate Remedy at Law</u>**

As more fully set forth in Section II L above, Norca will suffer grave and irreparable harm unless immediate injunctive relief is granted. Norca's ability to compete in the boiler tube business heavily depends on its exclusivity arrangement with Changwon. If defendants are not enjoined from further interfering with this relationship, Norca's will suffer losses for which it can never be fully compensated. *See Optinrealbig.com, LLC v. Ironport Systems, Inc.* 323 F.Supp.2d 1037, 1050 (N.D.Cal.,2004) (damage to business's goodwill, deprivation of unique contract right, or threatened existence of plaintiff's business can constitute irreparable injury, for purpose of

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

22

obtaining preliminary injunction); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908-909 (2nd Cir.1990) (where wrongful conduct deprives a plaintiff of a unique contract right, there may be an irreparable harm); *Rx USA Wholesale Services Inc., v. Department of Health and Human Services*, 467 F. Supp. 2d 285, (E.D.N.Y. 2006) ("[i]rreparable harm may be found where the moving party makes a strong showing that economic loss would significantly damage its business above and beyond a simple diminution in profits"). The need for injunctive relief is even more pressing here where many of the key witnesses reside in Asia and Norca therefore risks being unable to compel their testimony at trial or to obtain their documents.

Norca's goodwill and longstanding relationships with its customers will be irreparably damaged unless defendants are enjoined from, *inter alia*, stating that they have "replaced" Norca, referring to Norca's customers as theirs, using Norca's telephone and fax numbers on their advertisements and plagiarizing Norca's website. Monetary damages will be inadequate compensation because these relationships may be injured beyond repair and because the injury may be difficult to calculate. *See Optinrealbig.com, supra*, 323 F.Supp.2d at1050 ([d]amage to a business' goodwill is typically an irreparable injury because it is difficult to calculate"); *American Express Fin. Advisors, Inc. v. Yantis*, 358 F.Supp.2d 818, 835 (N.D.Iowa 2005) ("[i]ntangible injuries, such as injury to goodwill and business relationships with customers, may be found to constitute irreparable harm").

Defendants should also be enjoined from using and/or disclosing Norca's confidential information. Monetary damages would be an inadequate remedy as it would be impossible to fully compensate Norca for the loss of its critical information, in which it has invested years of effort in both developing and keeping confidential and which is key to Norca's success. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-103 (3d Cir. 1992) ("An intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm..."); *North Atlantic Instruments, Inc. v. Haber*, 188 F. 3d 38, 49 (loss of trade secrets cannot be measured in money damages).

PHILLIPS, ERLEWINE
& GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

23

Finally, even if Norca were able to calculate damages, a monetary judgment would still be inadequate because Norca would likely be unable to collect from the defendants, whose business is approximately three weeks old. *See Lakeview Technology, Inc. v. Robinson,* 446 F. 3d 655, 657 (7th Cir. 2006) ("[a]bility to *calculate* damages does not make that remedy adequate, however, if the plaintiff cannot *collect* the award.") (emphasis in original). Bahar Decl., ¶25c.

**D. Balancing of the Hardships and the Public Interest**

In considering the appropriateness of injunctive relief, the Court must balance the possible harm to the plaintiff in denying the request against the possible harm to the defendants in granting it. *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531 (1987). Here, defendants will suffer no undue hardship if the TRO is granted. The conduct Norca seeks to enjoin is already prohibited by statutory and common law. The requested TRO merely seeks to stop defendants from using Norca's trade secrets and other information, from unlawfully and unfairly competing with Norca, from unlawfully interfering with Norca's business relationships and from destroying or disposing of relevant evidence. The public interest will be served by granting the requested TRO since plaintiff seeks to enjoin defendants' false advertising and other anti-competitive activities.

## IV. THE COURT SHOULD PERMIT NORCA TO CONDUCT EXPEDITED DISCOVERY

The Court is authorized to issue an order permitting expedited discovery where good cause is shown. F.R.C.P. 26(d); *Semitool, Inc. v. Tokyo Electron America, Inc.,* 208 F.R.D. 273, 276 (N.D. Cal. 2002). Good cause exists when the need for discovery outweighs the potential prejudice to the party against whom discovery is sought. *Semitool,* 208 F.R.D. at 276-277 (ordering expedited discovery against defendants in a patent infringement case where discovery would allow plaintiff to determine which of its other patents were being infringed). Here, good cause exists for expedited discovery, including both depositions, document requests and document subpoenas, which is necessary for Norca to ascertain the full extent of the unlawful actions (e.g., solicitations, diversions, misrepresentations, misappropriations and other unlawful

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

24

conduct) by defendants, their agents, including but not limited to Primrose Alloy, Inc. and other actors, and to identify all of the actors involved in the unlawful conduct (some not yet ascertained.). This need is particularly pressing in light of the fact that Norca is seeking the discovery in connection with its request for a preliminary injunction. *Ellsworth Associates, Inc. v. U.S.*, 917 F.Supp. 841, 844 (D.D.C.,1996) ("Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings.") Immediate discovery is also necessary for plaintiff fully to determine the scope of defendants' interference with plaintiff's suppliers and customers so that Norca can attempt to mitigate its damages. The prejudice to defendants, if any, is minimal since the information sought is relevant and would otherwise be produced in the normal course of discovery. *See Semitool*, *supra*, 208 F.R.D., at 276.

The court should also grant plaintiff permission to take expedited discovery, including depositions and a document subpoena, directed to Wren's newly-established company, Primrose Alloys, Inc. Plaintiff first learned about the existence of Primrose Alloys, Inc. on June 30th. This company is apparently owned by Wren and is apparently carrying on the business previously conducted by Primrose Metals, Inc., although the exact nature and extent of this new company will not be fully known until discovery is conducted.

## V. CONCLUSION

For all the foregoing reasons, plaintiff respectfully requests that the court grant the requested temporary restraining order and preliminary injunction and permit expedited discovery.

DATED: July 2, 2007

PHILLIPS, ERLEWINE & GIVEN LLP

By: ______________________
R. SCOTT ERLEWINE
Attorneys for Plaintiff

PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, CA 94111
(415) 398-0900

MPA ISO MN FOR TRO, PREL. INJ., EXP. DISCOVERY - Case No. C03425 EDL
S:\Clients\Norca\8049.15 (Wren)\pld\mmb-tro-mpa-062907-2.wpd

25